**FORSALEBYOWNER.COM CORP., Plaintiff,**

v.

**Paula Reddish ZINNEMANN, in her official capacity as Commissioner of the California Department of Real Estate; William Lockyer, in his official capacity as Attorney General of the State of California, Defendants.**

**No. CIV. S 03–1019MCEGGH.**

United States District Court, E.D. California.

Nov. 18, 2004.

Colleen M O'Brien, O'Brien and Kelleher LLP, Walnut Creek, CA, Steven M Simpson, Institute for Justice, Washington, DC. William H Mellor, Pro Hac Vice, Institute for Justice, Washington, DC, for plaintiff.

Jeffrey Allen Rich, Attorney General's Office, Sacramento, CA, for defendant.

## MEMORANDUM AND ORDER

ENGLAND, District Judge.

In bringing the present action, Plaintiff ForSaleByOwner.com [1] (hereinafter "FSBO") challenges the State of California's real estate licensing requirements, as codified in California Business and Professions Code §§ 10000 et seq., on constitutional grounds. Specifically, FSBO seeks judicial determination that those licensing requirements, as enforced by Defendants Paula Reddish Zinnemann, Commissioner of the California Department of Real Estate, and Defendant Bill Lockyer, Attorney General of the State of California (hereinafter "Defendants") violates its rights under the First Amendment of the United States Constitution.

Presently before the Court are cross-motions for summary judgment filed both on behalf of FSBO and on behalf of the Defendants. For the reasons set forth below, summary judgment in favor of FSBO is granted.

## BACKGROUND

FSBO publishes an internet website that advertises properties for sale, including properties for sale in California. The FSBO site charges a flat fee to property owners who wish to advertise and sell their homes without incurring the substantial cost typically incurred by retaining a real estate agent. That fee varies depending on the advertising services chosen and the length of time the advertisement runs.

In addition to listing customers' properties on a nationwide database of properties, which can be viewed and searched on the FSBO website at no charge by prospective buyers, FSBO also provides other general information on its website. That information includes, but is not limited to, statistical information about home sales, crime, schools and costs of living in specific geographic locales. The FSBO site further incorporates interactive software for calculating mortgage payments and current data about interest rates.

There is no dispute that FSBO also markets itself to providers of various real estate related services (e.g., title insurance agents, escrow companies, inspectors, home improvement contractors and the like). Those providers pay FSBO for listing on a directory accessible through the website. Furthermore, FSBO pays individual real estate service providers, through a partnership and affiliate marketing program, for leads generated by such providers that result in an FSBO service listing.

While the FSBO website offers sample real estate forms, the website does not provide specific advice to individuals concerning buying or selling homes. The site contains a disclaimer to the effect that the company is not a real estate agent and is thus "legally prohibited from taking part in the actual sales transaction of any of the properties advertised on our site." (FSBO Undisputed Fact ("UF") 33). The fact that FSBO does not represent property

---

**1.** Jeffrey C. Chadbourne, d/b/a/ ForSaleByOwner.com magazine, was initially named as a Plaintiff but has since terminated his interest in this litigation, leaving ForSaleByOwner.com as the sole Plaintiff.

owners or potential purchasers in transactions involving California real estate is undisputed. (UF 34). Customers make contact directly with potential purchasers. FSBO does not negotiate or make any contact on behalf of customers, and does not otherwise take part in sales transactions. Moreover, FSBO does not charge or receive any commissions on sales which may result from the contact information it provides to its customers.

Although FSBO provides only generalized information concerning real estate and does not participate directly in particular real estate transactions, California law nonetheless contains stringent licensing requirements for anyone involved in the listing or sale of real property. Under California Business and Professions Code § 10130,[2] it is unlawful for any person or company to act as a real estate broker without first obtaining a California real estate license. Section 10131, in turn, defines a "real estate broker" as follows:

A real estate broker...is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:

(a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity.

. . . . .

(d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly

or collaterally by liens on real property or on a business opportunity.

Section 10131.2 expands the definition of real estate broker contained in Section 10131 by specifying that anyone charging an advance fee in connection with the sale, listing, or advertisement of real property is also considered a broker under California law:

A real estate broker...is also a person who engages in the business of claiming, demanding, charging, receiving, collecting or contracting for the collection of an advance fee in connection with any employment undertaken to promote the sale or lease of real property or of a business opportunity by advance fee listing, advertisement or other offering to sell, lease, exchange or rent property or a business opportunity, or to obtain a loan or loans thereon.

Finally, Section 10026 defines "advance fee" as including any fee charged for listing, advertising, or offering to sell or lease real property, except that a "newspaper of general circulation" is expressly exempted from that definition:

The term "advance fee,"... means a "fee claimed, demanded, charged, received, collected or contracted from a principal for a listing, advertisement or offer to sell or lease property, other than in a newspaper of general circulation, issued primarily for the purpose of promoting the sale or lease of business opportunities or real estate or for referral to real estate brokers or salesmen, or soliciting borrowers or lenders for, or to negotiate loans on, business opportunities or real estate".

FSBO falls squarely within the definition of "real estate broker," as that term is

---

2. Unless otherwise noted, all further references to "Section" or "Sections" are to the California Business and Professions Code.

defined by Sections 10131 and 10131.2 It unquestionably engages in the business of soliciting or obtaining listings of residential real property listing, and does so for compensation or profit in the form of an "advance fee." Moreover, because FSBO is undisputedly not a "newspaper of general circulation", it is not exempted under Section 10026 from California's licensing requirements.

In 2001 and 2002, the California Department of Real Estate ("DRE") sent letters to a number of internet companies, including FSBO, whose websites advertise and list properties for sale in California. The DRE noted that FSBO's website contained no real estate licensing disclosure and requested that FSBO identify the broker's license under which the company was operating. In fact, neither FSBO, or any of its officers or employees, holds a California real estate broker's license.

FSBO contends that any distinction between the treatment accorded its website and the exemption for newspapers is nonsensical given the current state of cybertechnology. It is undisputed, for example, that many newspapers now maintain websites operating in much the manner as the site generated by FSBO. Two examples are the Sacramento Bee and the Los Angeles Times, which operate websites that allow property owners in California to advertise their homes for sale for a flat fee. Customers can place ads over the Internet through these websites, and both papers charge customers in advance for publishing their ads on the website. Users of the newspaper websites can search properties for sale based on essentially the same search criteria available on FSBO's website. (FSBO UF 53). Significantly, the newspaper sites also include additional information of interest to property buyers and sellers, which, like the FSBO site, includes searchable information on schools, home prices, interest rates, and real estate news. Users of the Los Angeles Times website can even search for real estate brokers and apply for mortgages on line. (FSBO UF 55). Moreover, both the Sacramento Bee and the Los Angeles Times feature information and advice on their websites on how to buy and sell homes. (FSBO 56). According to FSBO, all this makes the service they offer virtually indistinguishable from that provided by newspapers, despite the fact that newspapers are exempted from the licensing requirements.

FSBO makes three arguments through the instant lawsuit. First, it contends that California's licensing requirements impose an unconstitutional "prior restraint" on speech that violates the First Amendment. Secondly, even if the speech at issue is deemed commercial in nature, FSBO argues that the limitations posed fail to pass constitutional muster. Finally, FSBO maintains that the restrictions imposed by California law are discriminatory, and violate principles of equal protection under both the First and Fourteenth Amendments, because of unwarranted distinctions based on both content, viewpoint and choice of media.

Both parties now move for summary judgment as to these claims. They conceded at oral argument on their respective motions that no material issues of disputed fact are present with respect to the claims asserted through FSBO's lawsuit. Hence resolution of this matter on summary judgment is appropriate, and each of the three contentions advanced by FSBO will be addressed in turn.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under summary judgment practice, the moving party

> "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank v. Cities Ser. Co.*, 391 U.S. 253, 288–289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R.Civ.P. 56(e). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers*, 971 F.2d 347, 355 (9th Cir.1992). Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Anderson*, 477 U.S. at 251, 106 S.Ct. 2505 (quoting *Schuylkill and Dauphin Improvement Co. v. Munson*, 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more that simply show that there is some metaphysical doubt as to the material facts ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348

## ANALYSIS

**A. The real estate licensing requirements at issue do not constitute an unconstitutional prior restraint of speech.**

■ FSBO first argues that California's real estate licensing requirements operate as an unconstitutional prior restraint of speech. According to FSBO, Sections 10131 and 10131.2 require the government's permission in the form of a real estate license in order to publish or disseminate real estate information. FSBO contends that this constitutes an impermissible prior restraint by requiring governmental permission as a prerequisite to speaking or publishing. *See Baby Tam & Co., Inc. v. City of Las Vegas*, 154 F.3d 1097, 1100 (9th Cir.1998), citing *Near v.*

*Minnesota,* 283 U.S. 697, 713, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

FSBO properly points out that prior restraints on speech are permissible only where they serve obviously proper purposes and are narrowly drawn. See *Riley v. Nat'l Fed. Of the Blind,* 487 U.S. 781, 802, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). Prior restraints are subject to careful scrutiny to ensure that no threat of censorship exists. *See, e.g., City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). According to FSBO, the California law at issue cannot withstand such scrutiny and is unconstitutional on its face as a restriction on speech and publication *per se.*

A facial challenge like that advocated by FSBO in its First Claim, however, will lie only in prior restraint cases where the law has a "close nexus" with speech or regulates "conduct commonly associated" with speech. *Southern Oregon Barter Fair v. Jackson County,* 372 F.3d 1128, 1135 (9th Cir.2004). In *Barter Fair,* the Ninth Circuit considered Oregon's Mass Gathering Act (Or.Rev.Stat. §§ 433.735–.770), a statutory scheme prohibiting outdoor gathering of large groups of persons without a permit issued by the Department of Health Services. In the face of application fee and insurance requirements as a prerequisite for issuance of the needed permit, the plaintiff argued that the Act on its face violated the First Amendment.

██ In assessing the plaintiff's facial challenge, the Ninth Circuit noted that facial challenges to legislation are generally disfavored, even though such disfavor is generally relaxed somewhat in the First Amendment context. The court nonetheless found that any willingness in this regard diminishes as the conduct targeted becomes less "expressive" in nature, and stated as follows: "[L]aws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship." *Id.,* citing *City of Lakewood v. Plain Dealer,* 486 U.S. at 760–61, 108 S.Ct. 2138. The court went on to make it clear that "a facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct..." *Id., see also Roulette v. City of Seattle,* 97 F.3d 300, 303–04 (9th Cir. 1996).

Although the Ninth Circuit found, in *Barter Fair,* that mass gatherings like those targeted by the Act bear a sufficient nexus to conduct commonly associated with expression, and consequently allowed the facial licensing challenge, the same conclusion cannot be made with respect to the real estate licensing laws at issue here. Those laws simply do not target patently expressive or communicative conduct.

As recognized by the Supreme Court in *City of Lakewood,* "[i]t is laws subjecting the exercise of First Amendment freedoms to license requirements that we have found suspect, not merely laws with some amorphous 'nexus' to expression." *City of Lakewood v. Plain Dealer,* 486 U.S. at 777, 108 S.Ct. 2138 (internal citation and quotations omitted). At most, the real estate licensing statutes challenged here have only an attenuated and indirect connection with expression that does not rise to the level permitting a facial free speech challenge. Consequently FSBO's facial challenge to California's real estate licensing law as a prior restraint fails.

**B. Commercial speech is not implicated.**

FSBO next contends that the licensing law impinges on its commercial speech

rights. Commercial speech is "expression related *solely* to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of New York,* 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), emphasis added. The *Central Hudson* standard is arguably more expansive than the traditional, narrow definition of commercial speech as "speech which does no more than propose a commercial transaction." *Virginia State Bd. of Pharm. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Because commercial speech is more readily subject to regulation, it is afforded a lesser degree of protection than other constitutionally guaranteed expression. *Central Hudson,* 447 U.S. at 562–563, 100 S.Ct. 2343. Commercial speech represents an accommodation between the right to speak and hear expression about goods and services and the right of government to regulate the sales of such goods and services. *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 499, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996)

■ Our first task is to determine whether a commercial speech analysis is appropriate in this case. In *Commodity Trend Service, Inc. v. Commodity Futures Trading Comm'n,* 149 F.3d 679 (7th Cir. 1998), the court examined whether the publisher of impersonal investment advice concerning the commodity futures market could properly attack, on First Amendment grounds, a requirement that it be registered as a commodity trading advisor. Similar to FSBO's position in the present case, the publisher in *Commodity Trend Service* argued that it did not provide personalized financial planning services or trading advice tailored to the individual needs of any particular subscriber.

The *Commodity Trend Service* court found the publications at issue to not be commercial speech because they "do not appear to propose commercial transactions between CTS and any customers," and instead "appear to provide information on commodity trading in general and leave any actual trading to other parties." *Id.* at 685–86. The court concluded that the publications in question were "not commercial speech because they do not propose a commercial transaction between CTS and a *specific customer.*" *Id.* at 686, citing *Board of Trustees of State Univ. Of New York v. Fox,* 492 U.S. 469, 473, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). (Emphasis added)

Likewise, in *Taucher v. Born,* 53 F.Supp.2d 464 (D.D.C.1999), which, like *Commodity Trend Service,* involves registration requirements under the Commodity Exchange Act, 7 U.S.C. § 1, et seq., the Court found that the provision of impersonal information providing generalized advice did not constitute commercial speech. *Id.* at 481. The fact that the publications at issue in *Taucher* included advertising materials did not render them commercial speech, with the Court emphasizing that the substance of the publications was not commercial since they proposed no commercial transaction directly between the publishers and any prospective customers. *Id.* at 480–81.[3]

Defendants here, in arguing that FSBO's website constitutes commercial speech, go on to contend that the licensing

---

**3.** Although *Taucher* ultimately found that the Commodity Exchange Act's registration requirement imposed an unconstitutional prior restraint of speech, the requirements in question directly regulated the provision of investment advice on commodity futures trading

and in so doing imposed "a drastic prohibition on speech." *Id.* at 482. As discussed above, this Court does not find that the licensing requirements here have a sufficient "nexus" to expressive conduct that makes a prior restraint facial challenge appropriate.

requirements applicable to California real estate brokers, as applied to FSBO, are a permissible regulation of the state's interest in ensuring professional responsibility and consumer protection as to such brokers. *Taucher* also rejects that argument. Citing the Supreme Court's decision in *Lowe v. Securities and Exchange Comm'n,* 472 U.S. 181, 232, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), *Taucher* states that "[w]here a personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice...." *Id.* at 477–478. Rather, *Taucher* found that publications it examined qualified as protected speech "[b]ecause the plaintiffs do not profit from their customers' gains or losses in the market and because the plaintiffs do not exercise judgment on behalf of their customers..." *Id.* at 479.

In the present case, like the circumstances confronted in both *Commodity Trend Service* and *Taucher,* FSBO does not propose a commercial transaction between FSBO and its customers. While FSBO does provide information in the form of real estate listings, and does supply other non-specific informational materials, it does not propose or encourage a direct sales transaction between itself and a prospective real estate purchaser. FSBO confirms this in its Opposition to Defendants' Motion for Summary Judgment, when it states at p. 18: "[T]he home advertisements on the website are not simply commercial speech, because they do not propose a commercial transaction between ForSaleByOwner.com and anyone else." [4]

It follows that FSBO's website, and the information it provides, is not subject to a commercial speech analysis.[5] Given the fact that FSBO's services are informational in nature and not tailored to the needs of any specific buyer, categorizing its speech as commercial would mean that any for-profit book, newspaper or periodical in the "do-it-yourself" arena would also constitute commercial speech. That runs counter not only to common sense but also to the holdings in both *Commodity Trend Service* and *Taucher* that the provision of generalized information does not implicate commercial speech.

That the speech interests implicated by FSBO's website are not commercial does not end the First Amendment analysis applicable to this case. As the Commodity Trend Service court recognized, "the Supreme Court has commented specifically that the First Amendment affords full protection to impersonal investment advice." *Commodity Trend Service,* 149 F.3d at 686, citing *Lowe,* 472 U.S. at 210, 105 S.Ct.

---

**4.** Moreover, FSBO seems to concede the inapplicability of a commercial speech analysis in its own Motion for Summary Judgment. At pp. 26–27 of its Opening Points and Authorities, FSBO states that California's "licensing scheme does not simply regulate commercial speech, and...must be justified under First Amendment doctrines that apply to fully-protected speech."

**5.** Having determined that FSBO's web-based real estate listings are not subject to scrutiny under a commercial speech analysis, the Court need not apply the four part analysis set forth by *Central Hudson* in analyzing the scope of permissible regulation on commercial speech. Those criteria include assessment of whether commercial speech is lawful and not misleading, and whether any proposed regulation "directly advances the governmental interest asserted" and is "not more extensive than is necessary to serve that interest." *Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. At oral argument, the parties agreed that the *Central Hudson* factors apply only to commercial speech.

2557. As discussed above, in this Court's view there is no analytical difference between the impersonal investment advice provided in *Commodity Trend Service* and the facilitation of real estate listings provided by FSBO here. In both instances there is no economic transaction directly between the party asserting its speech rights and potential customers. Hence, even apart from whether California law imposes an unconstitutional prior restraint or whether FSBO's activities are subject to regulation as commercial speech, to the extent the information disseminated by FSBO qualifies as non-commercial or "pure" speech it may still be entitled to protection on that basis.

**C. As applied to FSBO, California's real estate licensing laws constitute unconstitutional content and media-based regulation.**

 FSBO argues that California's real estate licensing laws amount to content-based regulation because they "single out" publishers of real estate advertising and information, like FSBO, "for a burden the state places on no other [speech] and is directed only at works with a specified content." *Simon & Schuster, Inc. v. New York State Crime Victims Bd.*, 502 U.S. 105, 115, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). FSBO contends that publishers of other sales magazines or websites *for* different products (like automobiles, jewelry or boats, for instance) are not required to be licensed, and even more significantly argues that newspapers of general circulation are exempt from real estate licensing requirements despite the fact that they offer services virtually identical to those provided by FSBO. According to FSBO, this differential treatment is unconstitutional unless the State's regulation "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Id.* at 118, 112 S.Ct. 501.

FSBO's argument that Section 10026 unconstitutionally discriminates based on media type is persuasive. The Court agrees that California's real estate licensing scheme impermissibly differentiates between certain types of publications carrying the same basic content. As indicated above, while Section 10026 exempts "newspapers of general circulation" from the advance fee provisions that trigger licensing requirement, websites like FSBO's are not so exempted. Given the uncontroverted fact that FSBO's activities are virtually identical to those pursued online by California newspapers, the distinction drawn between the two publishing mediums appears wholly arbitrary.

California cannot make arbitrary distinctions based on the manner of speech or the media used for publication. *See City of Lakewood v. Plain Dealer*, 486 U.S. at 763, 108 S.Ct. 2138 ("a law or policy permitting communication in a certain manner for some but not for other raises the specter of content and viewpoint censorship"); *Greater New Orleans Broadcasting Ass'n, Inc. v. U.S.*, 527 U.S. 173, 195, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("decisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment"); *City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) ("regulation of a medium inevit ably affects communication itself").

Defendants' only response is to categorize FSBO's claim in this regard as sounding solely on basic equal protection principles. According to Defendants, because FSBO has no "fundamental interest" in pursuing its internet real estate business, California's real estate licensing scheme only has to be examined on the basis of the

relatively lenient "rational basis" test.[6] Under that test, Defendants maintain that California needs only to demonstrate that its regulation "is rationally related to a legitimate state interest." *Lawline v. American Bar Assoc.*, 956 F.2d 1378, 1385 (7th Cir.1992).

Because Section 10026 discriminates between particular segments of the media (online publications on one hand and newspapers of general circulation on the other), the rational basis test does not apply. In *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir.2004), the Third Circuit held that a state statute preventing alcoholic beverage advertisers from running paid ads in media affiliated with educational institutions, but permitting such ads in magazines, newspapers or other periodicals with no such connection, was an unconstitutional content-based restriction on a student newspaper's First Amendment rights. In order to avoid the potential threat to free speech posed by laws targeting a particular sector of the media, *Pitt News* reasoned that such laws must be carefully examined. The court held that because the law in question targeted a narrow segment of the media, it was presumptively unconstitutional. *Id.* at 110–11. According to *Pitt News*, that presumption of unconstitutionality can be overcome "only by a showing that the challenged law is needed to serve a compelling interest." *Id.* at 111, *see also Minneapolis Star & Tribune*

*Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 582, 585, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (presumption can be overcome only by "an overriding government interest" of "compelling importance"); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("[W]e have frequently condemned... discrimination among different users of the same medium for expression).

Defendants cannot show a compelling state interest for Section 10026's differentiation between newspapers of general circulation and other outlets of media expression like FSBO's website. Indeed, given the fact that the online newspaper services and the FSBO website are virtually identical, there appears to be no justification whatsoever for any distinction between the two mediums. Even if a distinction was warranted in 1959, when the statute was amended to include the newspaper exemption, that does not mean that the same rationale for exempting newspapers remains viable in 2004, given the vast advances in technology that have occurred in the meantime.[7]

As FSBO points out, if use of the internet itself justifies state regulation, that would logically suggest that both online newspaper services and websites like FSBO's should be equally restricted. Instead, however, online newspaper advertising for real property is not subject to licensing, whereas the very same informa-

---

**6.** See Defendants' Opening Memorandum in Support of Summary Judgment, pp. 18–19; Opposition to FSBO Motion, fn. 1.

**7.** The Court is aware of the legislative history generated when Section 10026 was amended in 1959. According to that history, consumers were then at the mercy of unscrupulous promoters who made false and fraudulent misrepresentations to property owners in order to exact payment for services rendered in connection with real property transactions. In deciding to restrict the use of advance fees

in order to prohibit such behavior, the California Legislature noted that newspapers of general circulation had not been found to engage in the offending practices in question. See Cal. Stats.1959, ch. 2117, at § 14, pp. 4942–43. Accordingly newspapers were given more credibility and an exemption from the advance fee restrictions was provided to them. It goes without saying that the technology of today was never contemplated by the California Legislature when the 1959 amendments to Section 10026 were made.

tion disseminated by FSBO requires a real estate broker's license. That license entails substantial coursework requirements as well as passage of a rigorous broker's exam. Defendants have simply shown no compelling need why such requirements must be satisfied in the case of FSBO but need not be adhered to by newspapers.

While Defendants do offer several purported distinctions between FSBO's website and newspapers that they claim do justify differential treatment, those distinctions are totally unpersuasive and certainly do not rise, as they must, to the level of a compelling state interest. For example, Defendants point to FSBO's alleged "synergistic" effort to cultivate "market relationships" with other retailers, as opposed to a newspaper's provision of "more traditional advertising services" as a reason to exempt newspapers but not websites like FSBO's from real estate licensing requirements.[8] As factual support for this proposition, Defendants suggest that FSBO accepts fees from mortgage brokers for business generated through a website referral process, despite the fact that no such referral service is even available on the FSBO website for users in California.[9] The only other specific activity targeted by Defendants concerns referral fees paid by FSBO for customers directed through other websites.

Defendants have not demonstrated that these arrangements are improper, or that licensing will do anything to prevent or regulate any resulting improprieties. Defendants make no effort to show how regulating such activities constitutes a compel-

ling state interest, not to mention whether requiring FSBO to obtain a broker's license is a remedy narrowly tailored to address such an interest. Otherwise, while Defendants vaguely attempt to paint newspapers as geographically situated and relatively more stable than internet companies, they have not established why this should require websites like FSBO's to obtain a California broker's license as a prerequisite to listing properties for sale, when online services doing exactly the same thing are not subject to any licensing requirement so long as they are operated by a "newspaper."[10] Defendants provide no reasonable explanation whatsoever for this differential treatment, let alone a compelling interest to justify it.

Because FSBO unquestionably has a speech interest in disseminating real estate information through its website, and because Defendants have not shown any compelling state interest in requiring a real estate broker's license for FSBO's website but not for virtually identical newspaper websites, the presumption of unconstitutionality triggered by this disparity of treatment has not been overcome. Section 10026 accordingly fails constitutional muster on that basis.

## CONCLUSION

Based on the foregoing, summary judgment in favor of Plaintiff FSBO is hereby GRANTED on grounds that Section 10026, as applied to FSBO, is unconstitutional. Defendants' motion for summary judgment is DENIED. The Clerk of the Court is

---

8. See Defendants' Memorandum of Points and Authorities in Support of Summary Judgment, p. 20, n. 16.

9. See Second Declaration of Colby Sambrotto at ¶ 9; Declaration of Jonathan Holbrook Jr. at ¶ 5.

10. Apparently, Defendants argue that newspapers of general circulation, as opposed to magazines or website publications, are cloaked with some form of trustworthiness simply because they are newspapers.

accordingly directed to enter judgment in favor of FSBO.

IT IS SO ORDERED.